# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **THE AMERICAN INSTITUTE FOR CHARTERED PROPERTY CASUALTY UNDERWRITERS,** *et al.* | : : : : | **CIVIL ACTION** |
| | : | **NO. 19-5369** |
| *Plaintiffs* | : | |
| | : | |
| **v.** | : | |
| | : | |
| **SYDNEY POSNER,** *et al.* | : | |
| *Defendants* | : | |

NITZA I. QUIÑONES ALEJANDRO, J.                                JUNE 22, 2022

# MEMORANDUM OPINION

## INTRODUCTION

Defendant/Counterclaim Plaintiff Sydney Posner ("Posner") asserted counterclaims against her former employer, Defendants The American Institute for Chartered Property Casualty Underwriters and The Institutes LLC (collectively, "AICPCU"), for breach of contract and unpaid wages under the Pennsylvania Wage Payment and Collection Law (the "WPCL"), 43 Pa. Cons. Stat. § 260.1 *et seq.*, premised on her allegations that AICPCU failed to pay her severance and earned commissions following her termination of employment on September 20, 2019.  Before this Court are AICPCU's motion for summary judgment with respect to Posner's counterclaims, [ECF 124], Posner's response in opposition, [ECF 130], and AICPCU's reply, [ECF 135].  The issues raised by the parties have been fully briefed and are ripe for disposition.  For the reasons set forth herein, AICPCU's motion for summary judgment is granted *in part* and denied *in part*.

**BACKGROUND**

When ruling on a motion for summary judgment, a court must consider all record evidence and supported relevant facts in the light most favorable to the non-movant—here, Posner. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *Galena v. Leone*, 638 F.3d 186, 196 (3d Cir. 2011). The facts relevant to the underlying motion are summarized as follows:[1]

> AICPCU acquired the assets of Posner's previous employer, CLM Group, Inc. AICPCU offered to retain Posner in her same position (Chief Relationship Officer), submitting a written offer of employment on May 28, 2018 (the "Initial Offer Letter"). In addition to the offered salary, retention bonus, and various benefits, the Initial Offer Letter included the following with respect to commissions:
>
> > You will earn 8% commission on all sales. Commissions will be paid out three times per year, after the following periods or events: commissions earned from sales during the period of January through June, commissions earned from sales during the period of July through December, and commissions earned from sales for the CLM Annual Conference.
> >
> > You must be an active employee of The Institutes on the date of the commission payout to receive the commission pay.
> >
> > ***
> >
> > Any adjustments to your compensation and commission structure will be at the sole discretion of The Institutes in accordance with its business needs and expectations.
>
> This Initial Offer Letter also included the following:
>
> > As a condition of your employment with The Institutes, you will be required to sign and return the enclosed Confidentiality, Non-Solicitation and Noncompetition Agreement.
> >
> > ***
> >
> > To accept this offer, kindly sign and date where indicated below no later than June 4, 2018 and return the signed letter, and the signed

---

[1] These facts are taken from the parties' briefs, exhibits, and statements of facts. To the extent that any facts are disputed, such disputes will be noted and, if material, will be construed in Posner's favor pursuant to Federal Rule of Civil Procedure ("Rule") 56.

Confidentiality, Non-Solicitation and Noncompetition Agreement,
to Human Resources.

Included with the Initial Offer Letter was the referenced Confidentiality,
Non-Solicitation and Noncompetition Agreement (the "Original Proposed
Agreement").  The Original Proposed Agreement included a non-solicitation
provision and a non-competition provision.  The bottom of each page of the four-
page Original Proposed Agreement included a place for both Posner and AICPCU
to insert their initials.  In addition, the fourth page included a place for Posner to
sign the agreement.  Notably, the Original Proposed Agreement contained no
provision for severance.

Upon receipt, Posner forwarded the Initial Offer Letter and Original
Proposed Agreement to her attorney, Richard E. King ("Attorney King"), for
review on June 1, 2018.  The next day, on June 2, Attorney King forwarded a
redlined, edited version of the Original Proposed Agreement to Posner (the "King
Redline").  Attorney King described his edits as "pretty hard core, but a good place
to start."  Attorney King's edits included deletion of the entire "Non-Competition"
provision and most of the related "Restricted Period And Territory" provision.  At
the end of these deletions, Attorney King inserted the following comment in the
margin of the document:

> Commented [REK2]:  If a non-compete is a deal breaker, then if
> enforced, Sydney must have severance of 2 years of salary and
> average bonus of last 2 years (including time prior to The Institutes
> purchase.  This severance would apply to any enforcement of the
> Non-Competition and/or Restricted Period and Territory, including
> but not limited to termination For Cause.

Notably, other than the above reference to severance appearing in the margin
comment, Attorney King did not add any severance provision to the body of the
agreement.  Later in the King Redline, Attorney King inserted another comment in
the margin of the document addressing the choice of law provision:

> Syd, if they push for the non-compete and you have to give in, I
> would try to argue for Florida law to apply.  I did some quick
> research and Florida's non-compete laws are just a little better than
> Penn, plus you will get home field advantage.

On June 4, 2018, Posner emailed Katherine Horowitz ("Horowitz"), a
senior vice president with AICPCU, with questions about the paperwork.  Posner
wrote the following:

- On the first page it lists my annual salary and retention bonus
  (thank you), but it does not list my 8% commission.

- I am finalizing all of the documents and came across the Confidentiality, Non-Solicitation and Noncompetition agreement. I have forwarded it to my attorney for review but will need to discuss this as I currently do not have a Non-Compete with CLM. Is there a good time/day for you?

Posner and Horowitz spoke on the phone on June 6. During this conversation, Posner expressed hesitancy to agree to a non-competition provision without the addition of a severance provision. Posner voiced no issue with the non-solicitation provision.

At 9:19 AM on June 6, after the telephone conference, Horowitz sent Posner an "updated offer letter" that included, *inter alia*, a description of Posner's salary, bonus, and commission structure. This "updated offer letter," dated May 30, 2018, contained the same terms described above and repeatedly referenced, but did not include a copy of, the Confidentiality, Non-Solicitation and Noncompetition Agreement.[2]

Later that day (June 6), at 3:24 PM, Posner sent Horowitz an email that contained a signed copy of the Initial Offer Letter and a redlined, edited version of the Original Proposed Agreement (the "Posner Redline"), which Posner described as the "Non-compete with edits from my attorney that are suggestions and a starting point and by no means demands." The Posner Redline, like the King Redline described above, deleted the entire "Non-Competition" provision and most of the related "Restricted Period And Territory" provision. At the end of these deletions was the following comment in the margin of the document (the "Margin Severance Comment"):

Commented [REK1]: Sydney must have severance of 2 years of salary and average bonus of last 2 years (including time prior to The Institutes purchase. This severance would apply to any enforcement of the Non-Competition and/or Restricted Period and Territory, including but not limited to termination For Cause.

This comment was similar to, but slightly different from, the one included in the King Redline. Notably, like the King Redline, the Posner Redline did not add a severance provision to the body of the agreement.

The next day, June 7, at 10:53 AM, Horowitz sent Posner an email in which she wrote:

Please find attached updates to the agreement. We changed the title to the agreement and deleted references to "non-competition"

---

[2]     Neither party explains how this "updated offer letter" differs in any way from the Initial Letter Offer.

throughout.  Hopefully this is a happy middle ground to protecting
you and protecting us.

Attached to this email was another redlined, edited version of both the Initial Offer
Letter and the Original Proposed Agreement (the "AICPCU Redline").  The
AICPCU Redline eliminated all references to "noncompetition," including several
such references that Posner's attorney, Attorney King, had not previously
eliminated.  This redline also included a number of additional, substantive changes
that were not part of the King or Posner Redlines.  While the AICPCU Redline
retained the margin comment concerning severance added to the previous version
by Attorney King, the AICPCU Redline inserted another margin comment, under
Attorney King's comment, that provided:  "We are deleting the non-competition
requirements."  Notably, like the Original Proposed Agreement and the King and
Posner Redlines, the AICPCU Redline did not add a severance provision to the
body of the agreement.

The clean version of the AICPCU Redline (the "Final Clean Agreement")
reflected all of the proposed revisions that AICPCU had accepted and those new
edits proposed by AICPCU in the body of the agreement itself, and contained no
margin comments.   The Final Clean Agreement did not contain either a
noncompetition provision or a severance provision.

Later that day (June 7), at 6:04 PM, Posner sent Horowitz an email in which
Posner wrote: "This is so extremely fair.  I have attached the signed agreement.
Thank you so much for listening and hearing me.  I truly appreciate you."  Attached
to the email was a copy of the redlined, edited Initial Offer Letter (reflecting the
elimination of all references to noncompetition), signed by Posner and dated June
1, 2018.  Though disputed, Posner contends she also signed the AICPCU Redline
version of the Original Proposed Agreement.

As Chief Relationship Officer, Posner was primarily responsible for the sale
of sponsorships in support of AICPCU's events.   Throughout Posner's tenure,
AICPCU paid Posner commissions for her sales.  In September 2018, AICPCU
changed the frequency of commission payments from three times per year to
quarterly; under the new scheme, commissions were to be paid on January 15, April
15, July 15, and October 15.

On July 31, 2019, Posner received an Employee Acknowledgment,
detailing AICPCU's "New Commission Payout Structure."  The notice provided:

As was discussed at the beginning of this year, the methodology for
the payout of commissions will change effective July 1, 2019.  If
you are currently on a monthly commission pay cycle, the change
will commence with the commissions that will be paid on 8/15/19
for July events.  If you were paid quarterly, the change will
commence with the 7/31/19 commission payout for 2nd quarter.

This change is being implemented to align the payout structure with standard methods used by other industries.

**Compensation Plan Revisions**
- Commissions will be paid in the first payroll of each month in accordance with your current commission rate.
- Commissions for the events taking place in the month will be paid on those events and/or ads for which the invoices have been paid and are, therefore, 'earned' commissions.
- Commissions will continue to be paid in arrears; July paid events will be paid in August.

Posner signed the acknowledgement on August 1, 2019.  AICPCU terminated Posner's employment on September 20, 2019.

With respect to her claim for unpaid commissions, Posner has attached a spreadsheet (supported by her own sworn declaration) that purports to show numerous sponsorships that she sold and for which the sponsors paid invoices between July 9, 2018, and Posner's termination on September 20, 2019.

## LEGAL STANDARD

Rule 56 governs summary judgment motion practice.  Fed. R. Civ. P. 56.  Specifically, this Rule provides that summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  *Id.*  A fact is "material" if proof of its existence or non-existence might affect the outcome of the litigation, and a dispute is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson*, 477 U.S. at 248.  When evaluating a motion under Rule 56, the court must view the evidence in the light most favorable to the nonmoving party.  *Galena*, 638 F.3d at 196.

Pursuant to Rule 56, the movant bears the initial burden of informing the court of the basis for the motion and identifying those portions of the record that the movant "believes demonstrate the absence of a genuine issue of material fact."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  This burden can be met by showing that the nonmoving party has "fail[ed] to make a

6

showing sufficient to establish the existence of an element essential to that party's case." *Id.* at
322. After the movant has met its initial burden, summary judgment is appropriate if the
nonmoving party fails to rebut the movant's claim by "citing to particular parts of materials in the
record, including depositions, documents, electronically stored information, affidavits or
declarations, stipulations . . . , admissions, interrogatory answers, or other materials" that show a
genuine issue of material fact or by "showing that the materials cited do not establish the absence
or presence of a genuine dispute." Fed. R. Civ. P. 56(c)(1)(A)–(B). The nonmoving party must
"do more than simply show that there is some metaphysical doubt as to the material facts."
*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The nonmoving
party may not rely on "bare assertions, conclusory allegations or suspicions," *Fireman's Ins. Co.
of Newark v. DuFresne*, 676 F.2d 965, 969 (3d Cir. 1982), nor rest on the allegations in the
pleadings, *Celotex*, 477 U.S. at 324. Rather, the nonmoving party must "go beyond the pleadings"
and, either by affidavits, depositions, answers to interrogatories, or admissions on file, "designate
'specific facts showing that there is a genuine issue for trial.'" *Id.*

**DISCUSSION**

As noted, AICPCU seeks summary judgment with respect to Posner's counterclaims for
breach of contract and violation of the WPCL. Each of these claims will be addressed separately.

### *Posner's Breach of Contract Claim for Unpaid Severance*

Posner's first breach of contract claim is premised on her contention that her written
employment agreement with AICPCU entitled her to severance following her termination for
cause. AICPCU argues that Posner's final, negotiated employment agreement did not include any
provision for severance. As such, resolution of this claim necessarily turns on whether the
employment agreement governing Posner's employment relationship with AICPCU included any

provision for the payment of severance.  For the reasons discussed below, this Court finds, as a matter of law, that it did not.

    To succeed on a claim for breach of contract, a party must prove (1) the existence of a contract, including its essential terms, (2) a breach of a duty imposed by the contract, and (3) resultant damages.  *Ware v. Rodale Press, Inc.*, 322 F.3d 218, 225 (3d Cir. 2003) (citing *CoreStates Bank, N.A. v. Cutillo*, 723 A.2d 1053, 1058 (Pa. Super. Ct. 1999)).[3]  An enforceable contract requires an offer, acceptance, and consideration.  *Jenkins v. Cnty. of Schuylkill*, 658 A.2d 380, 383 (Pa. Super. Ct. 1995).  "[A] reply to an offer which purports to accept it, but changes the conditions of the offer, is not an acceptance but is a counter-offer, having the effect of terminating the original offer."  *GMH Assocs., Inc. v. Prudential Realty Grp.*, 752 A.2d 889, 899 (Pa. Super. Ct. 2000) (citations omitted); *see also Shaer v. Ortho. Surg. of Cent. Pa., Ltd.*, 938 A.2d 457, 463 (Pa. Super. Ct. 2007).  "If a reply does not unequivocally accept the terms of an offer, then no contract is formed."  *Delaware River Pres. Co., Inc. v. Miskin*, 923 A.2d 1177, 1181–82 (Pa. Super. Ct. 2007).  This determination is one of law for the court to decide.  *Id.*  "For a contract to be enforceable, the nature and extent of the mutual obligations must be certain, and the parties must have agreed on the material and necessary details of their bargain."  *Lackner v. Glosser*, 892 A.2d 21, 30 (Pa. Super. Ct. 2006) (citations omitted).  An agreement is binding only if the parties "come to a meeting of the minds on all essential terms."  *Commerce Bank/Pa. v. First Union Nat. Bank*, 911 A.2d 133, 147 (Pa. Super. Ct. 2006).

    Discerning the parties' intent is the primary objective of contract interpretation, and the strongest expression of the parties' intent is the language of the contract itself.  *Baldwin v. Univ.*

---

[3]    The parties agree that Pennsylvania law applies to Posner's breach of contract claims.  This Court agrees, particularly in light of the inclusion of a Pennsylvania choice of law provision in Posner's employment agreement.

*of Pittsburgh Med. Ctr.*, 636 F.3d 69, 75–76 (3d Cir. 2011).  In ascertaining the existence of mutual assent, the relevant inquiry is what a reasonable person would understand the intent of parties to be given their objective manifestations.  *Am. Eagle Outfitters v. Lyle & Scott Ltd.*, 584 F.3d 575, 582–84 (3d Cir. 2009); *Baldwin*, 636 F.3d at 75 ("Courts are to consider not the inner, subjective intent of the parties, but rather the intent a reasonable person would apprehend in considering the parties' behavior." (internal quotations omitted)).  When the terms of a contract are unambiguous, the court must give effect to the plain meaning of the agreement as a matter of law.  *Ins. Adjustment Bureau, Inc. v. Allstate Ins. Co.*, 905 A.2d 462, 468 (Pa. 2006).  The parties' disagreement as to the proper construction of the contract does not render a contract ambiguous.  *Pacific Emps. Ins. Co. v. Glob. Reinsurance Corp. of Am.*, 693 F.3d 417, 426 (3d Cir. 2012).  Rather, "contractual terms are ambiguous if they are subject to more than one reasonable interpretation" when applied to the facts of the case.  *Murphy v. Duquesne Univ. of the Holy Ghost*, 777 A.2d 418, 430 (Pa. 2001) (citation omitted).

On the other hand, "[c]lear contractual terms that are capable of one reasonable interpretation must be given effect without reference to matters outside the contract."  *Am. Eagle*, 584 F.3d at 587.  "Where the written terms of the contract are not ambiguous and can only be read one way, the court will interpret the contract as a matter of law."  *Hullett v. Towers, Perrin, Forster & Crosby, Inc.*, 38 F.3d 107, 111 (3d Cir. 1994).  If the court determines the contract is ambiguous, "then the interpretation of the contract is left to the factfinder, to resolve the ambiguity in light of extrinsic evidence."  *Id.*

Posner contends she is entitled to severance because the final *redlined* version of the agreement—the AICPCU Redline, which she claims to have signed—contained an enforceable severance provision in the margin of the document.  AICPCU argues that the final, *clean* version

of the agreement clearly did not contain a severance agreement, and, in the alternative, AICPCU never manifested its intent to be bound by any severance provision contained solely in a margin comment on a redlined version. This Court finds, as a matter of law, that the final version of the agreement did not contain a severance provision and, in the alternative, that AICPCU never manifested its intent to be bound to any such severance provision.

It is undisputed that AICPCU's original offered agreement (the "Original Proposed Agreement") contained a noncompetition provision, but no severance provision. As previously noted, Posner responded to Original Proposed Agreement with a redlined version of the agreement (the Posner Redline) that, *inter alia*, struck the entire noncompetition provision and inserted a comment in the margin clearly related to the proposed elimination of the noncompetition provision (the Margin Severance Comment). As noted earlier, the Margin Severance Comment provided:

> Sydney must have severance of 2 years of salary and average bonus of last 2 years (including time prior to The Institutes purchase. This severance would apply to any enforcement of the Non-Competition and/or Restricted Period and Territory, including but not limited to termination For Cause.

Notably, Posner did not add a severance provision to the body of the agreement itself. The only reference to severance is contained in the margin comment set forth above. Further, in the email accompanying the Posner Redline, Posner wrote that she had attached the "non-compete with edits from my attorney that are suggestions and a starting point and by no means demands." Based on these facts, the Posner Redline, which altered the terms of the original offer, constituted a rejection of AICPCU's original offer and a counteroffer to either be accepted, rejected, or revoked. *See GHM Assocs., Inc.*, 752 A.2d at 899; *see also* Restatement (Second) of Contracts § 36.

AICPCU responded to Posner's counteroffer with its own redlined, edited version of the Posner Redline (the AICPCU Redline). The AICPCU Redline eliminated all references to

"noncompetition" and inserted proposed revisions to the "No Solicitation" provision (adding back the previously deleted "clients, vendors, or sponsors" phrase) and the Restricted Period and Territory provision (eliminating "The Restricted Territory consists of Florida and Pennsylvania"). Though the AICPCU Redline included the Margin Severance Comment that had been inserted into the Posner Redline, it added an additional margin comment directly below the Margin Severance Comment that provided:  "We are deleting the non-competition requirements."  The AICPCU Redline did not contain any severance provision in the body of the agreement.[4]  The clean version of the AICPCU Redline (the Final Clean Agreement) reflected all of the proposed revisions that AICPCU had accepted and those new edits proposed by AICPCU in the body of the agreement itself and contained no margin comments.  The Final Clean Agreement did not contain either a noncompetition provision or a severance provision.[5]  The AICPCU Redline and its corresponding Final Clean Agreement altered the terms of the Posner Redline.  Thus, the AICPCU Redline and the corresponding Final Clean Agreement constituted a rejection of Posner's counteroffer contained in the Posner Redline and a new counteroffer to be accepted, rejected, or revoked.  *See GHM Assocs., Inc.*, 752 A.2d at 899; *see also* Restatement (Second) of Contracts § 36.  Notably, the AICPCU Redline (and corresponding Final Clean Agreement) was the last version of the negotiated agreement exchanged between the parties and, thus, the last offer to be either accepted or rejected by Posner.  Further, there is no dispute that Posner accepted the terms of her employment agreement, as she worked for and was paid by AICPCU between June 1, 2018, and

---

[4]      It is apparent that AICPCU understood  and knew how to insert a provision directly into the body of the agreement, as evidenced by its insertion of "clients, vendors or sponsors" into the body of the agreement.  Thus, had AICPCU intended to include a severance provision in its counteroffer, *i.e.*, the AICPCU Redline, one would reasonably expect AICPCU to have included such a provision in the body of the agreement.

[5]      Indeed, no clean versions of the agreement contain a severance provision.  The severance provision appears solely in the Margin Severance Comment added to the Posner Redline.

September 20, 2019.   As clearly reflected in the Final Clean Agreement, AICPCU's final counteroffer did not contain either a noncompetition provision or a severance provision.   As such, Posner's contract claim for severance is without merit.

Nonetheless, Posner argues that the AICPCU Redline, rather than the Final Clean Agreement, was the enforceable contract and, thus, she was entitled to severance.   While Posner purports to have signed the redlined, edited version (as opposed to the clean version) of the AICPCU Redline, she presents no evidence that she ever provided a copy of the signed redline to AICPCU.   Regardless, this Court finds, as a matter of law, that, like the Final Clean Agreement, the corresponding AICPCU Redline does not include a severance provision.   As noted, the purported severance provision does not appear anywhere in the body of the AICPCU Redline, but rather appears solely in the margin comment.   As it physically appears on the Posner Redline, the Margin Severance Comment is clearly and unambiguously connected to Posner's corresponding deletion of the noncompetition provision.   It is clear from the content of the Margin Severance Comment that Posner was offering to accept a noncompetition provision only if the parties added a provision for severance.   It is equally clear from AICPCU's own margin comment in response to the Margin Severance Comment that it was accepting Posner's deletion of the noncompetition provision in lieu of adding a severance provision.   Thus, even if the signed AICPCU Redline version was the final, enforceable version of the employment agreement, it does not contain any severance provision.

Further, this Court agrees with AICPCU's argument that it is generally understood that comments inserted on a draft contract through computer document review applications are not part of the body of the agreement.   Rather, they are communications between the parties constituting part of the negotiation process.   Such comments are the equivalent of handwritten notes on a draft

document or correspondence explaining the reasons for edits in the body of the agreement itself, suggesting alternative terms, or otherwise negotiating a deal.  It is difficult to conclude that parties intend to be bound by such comments in the margin without some additional indication of the parties' intent to be bound by such comments.  For example, a party might manifest its intent to be bound by a comment in the margin, like a handwritten note or edit, by initialing the edit and/or inserting the accepted addition into the body of the agreement.  Here, there were no such indications of AICPCU's acceptance of the purported severance provision otherwise appearing solely in the Margin Severance Comment.  In light of these undisputed facts, this Court finds that AICPCU did not manifest its intent to be bound by the Margin Severance Comment.

### *Posner's Breach of Contract Claims for Unpaid Commissions*

Posner has also asserted breach of contract claims for unpaid commissions for her sale of sponsorships.  Unlike with respect to severance, the parties agree that Posner's employment agreement included a term for the payment of commissions.  The parties dispute, however, whether commissions were earned prior to the client's payment for the sponsorships sold and/or the occurrence of the corresponding event, as well as whether Posner has presented evidence sufficient to create a genuine issue of material fact as to her claims for commissions.

Posner's original employment agreement provided for the payment of commissions on all "sales" of sponsorships that Posner made.  Under the original commission payout structure, Posner's earned commissions were to be paid out three times a year, as described more fully below. The parties agree that sometime in September 2018, the payout structure for Posner's commissions was changed to quarterly payments—on January 15, April 15, July 15, and October 15.  By notice dated July 31, 2019, and signed by Posner on August 1, 2019, the payout structure was changed again.  As conceded by Posner, under the new structure, payment of commissions was conditioned

"on whether or not a sponsorship was paid, and whether the sponsorship event had occurred; commissions would not be paid until the month after the sponsorship event occurred." (Posner Opp., ECF 130, at p. 18). By its terms, the new commission payout structure went into effect on July 1, 2019.

Under the commission payout structure set forth in Posner's Initial Offer Letter, which the parties agree was in effect through at least July 1, 2019, Posner was entitled to the payment of an 8% commission on all of her "sales" of sponsorships. The parties dispute whether "sales," as used in the original agreement, required full payment by the client and the occurrence of the event before a commission was earned. Other than the use of the word "sales," the original agreement is silent with respect to the client's payment for its sponsorship of the corresponding event. Interpreting this undefined term, this Court must construe the word "in accordance with [its] natural, plain, and ordinary meaning." *Profit Wize Marketing v. Wiest*, 812 A.2d 1270, 1274 (Pa. Super. Ct. 2002). This Court may not "modify the plain meaning of the word[ ] under the guise of interpretation or give the language a construction in conflict with the accepted meaning of the language used." *Id.* at 1274–75. "Sales" is commonly defined as the following:

- The act of selling, specifically: the transfer of ownership of and title to property from one person to another ***for a price***. Merriam-Webster Dictionary. (emphasis added).

- An act of exchanging something ***for money***. Cambridge Dictionary (emphasis added).

- The sale of goods is the act of selling them ***for money***. Collins English Dictionary (emphasis added).

In the absence of any language to the contrary, this Court finds that under the original commission payout structure, Posner did not earn a commission until the client paid in full for the sponsorships sold.

Addressing the parties' differing interpretations as to any additional requirement that a sold event occur before a commission is earned,[6] the commission provision in the original agreement provides:

> Commissions will be paid out three times per year, ***after the following periods or events***:  commissions earned from sales during the period of January through June, commissions earned from sales during the period of July through December, and commissions earned from sales for the CLM Annual Conference.   (Emphasis added).

This provision requires the payment of commissions "after the following periods or events: . . . ." This phrase is followed by a list of two clearly identified "periods" (January through June and July through December) and one clearly identified "event" (the CLM Annual Conference).  Pursuant to this clear and unambiguous language, this Court finds that the only commission payout requiring the occurrence of both a sale *and* an "event" is a commission for a sale associated with the CLM Annual Conference.  Commissions for all other sales are due following completion of the sale, *i.e.*, full payment by the client.

As noted, the parties agree that the above payout structure was amended in September 2018 such that Posner would be paid quarterly (the "September 2018 Payout Structure"), rather than the three times per year under the original payout structure.  Neither party offers any evidence or argument as to any other change to the commission provision.  The parties also agree that the original commission provision, with the September 2018 modification, remained in effect until at least July 1, 2019.

In support of her claim for unpaid commissions, Posner relies on her declaration and two spreadsheets attached thereto (Exhibits C and D).  In her declaration, Posner attests, *inter alia*, that

---

[6]     As noted, the parties agree that the new commission payout structure requires both client payment and the occurrence of the event before a commission is earned.

she sold a number of sponsorships prior to AICPCU's July 1, 2019 modification to the commission

payout structure (the "July 2019 Payout Structure").  Exhibit C to Posner's declaration identifies

a number of sales for sponsorships that Posner made for which the clients paid prior to July 1,

2019.  These pre-July 1, 2019 sales are governed by the September 2018 Payout Structure, under

which, as described above, the payment of a commission was triggered once the client fully paid

for the sponsorship (regardless of the occurrence of the event).  By way of her declaration and

Exhibit C, Posner has presented evidence from which a juror could find that she was entitled to a

commission for those sales that were complete before July 1, 2019.  As such, AICPCU's motion

for summary judgment is denied with respect to Posner's claims for the unpaid commissions

identified in Exhibit C.

Posner relies on Exhibit D to support her claim for additional commissions for sponsorship

sales for events that she contends occurred prior to July 2019.  Exhibit D shows, *inter alia*, a

number of purported sales of sponsorships for which the clients made payments between July 19,

2019, and August 30, 2019, for events that occurred prior to July 2019.  Posner argues that this

evidence creates a genuine issue of material fact as to whether she is entitled to a commission for

these sales under the September 2018 Payout Structure.  Posner's argument in this regard is,

however, misplaced.  As noted, Posner has conceded that under the September 2018 Payout

Structure, she was paid commissions quarterly—on January 15, April 15, July 15, and October 15.

Thus, any commissions for sales that closed between July 19, 2019, and August 30, 2019 (when

the client made payments) would have been paid on October 15, 2019.  Posner has also conceded

that to receive any commissions, her agreement required that she be employed on the date of the

payout.[7]  Posner's employment was terminated on September 20, 2019.  As such, Posner was not employed when the commissions were due to be paid.  Accordingly, Posner is not entitled to these commissions under the September 2018 Payout Structure.

Posner argues, in the alternative, that she has presented evidence sufficient to create a genuine issue of material fact as to her entitlement to these commissions under the July 2019 Payout Structure.  Because these purported sales closed after July 1, 2019 (the effective date of the July 2019 modified payout structure), they are governed by the July 2019 Payout Structure.  As argued by AICPCU and conceded by Posner, under the July 2019 Payout Structure, payment of commissions was conditioned on the occurrence of the event and payment of the sponsorship by the client.  Exhibit D shows a number of purported sales for which the clients made payments between July 19, 2019, and August 30, 2019, for events that occurred prior to July 2019.  Under the July 2019 Payout Structure (unlike the September 2018 Payout Structure), commissions were to "be paid in the first payroll of each month . . . ."  Thus, any commissions earned in July and/or August 2019 were to be paid during the first payrolls in August and September 2019—dates when Posner was still employed by AICPCU.  As such, by way of her declaration and Exhibit D, Posner has presented evidence from which a juror could find that she was entitled to a commission for those sales that were complete by August 30, 2019 (*i.e.*, sales of sponsorships for which the clients had made payment and the corresponding events had occurred before August 30, 2019).  Accordingly, AICPCU's motion is denied with respect to Posner's claims for the unpaid

---

[7]      "Where a bonus or incentive requires that an employee be actually employed by the employer at the time the payment comes due, the employee has not earned that bonus or incentive."  *Blackwell-Murray v. PNC Bank*, 963 F. Supp. 2d 448, 470 (E.D. Pa. 2013) (granting summary judgment to defendant on claim for commission where employee was not on payroll at time incentive was to be paid); *DiJoseph v. Metro. Life Ins. Co.*, 1995 WL 89020, at *4 (E.D. Pa. Mar. 1, 1995) (granting summary judgment to defendant on claim for unpaid commissions where contract provided "salesperson must be actively employed . . . on the date the payment is issued," and plaintiff was terminated prior to payout date).

commissions identified on Exhibit D for sales that were paid by the respective clients by August 30, 2019.

Exhibit D also shows, *inter alia*, a number of purported sales for which the clients made payments between September 1, 2019, and September 13, 2019.  Under either the September 2018 Payout Structure or the July 2019 Payout Structure, commissions for these sales would not be paid until October 2019.  Posner's employment was terminated on September 20, 2019, before the commission payout was due under either payout structure.  Posner concedes that she was required to be employed on the date of the commission payout in order to be entitled to it.  As such, based on the undisputed evidence presented, Posner is not entitled to any of the commissions identified on Exhibit D for which the client's payments were made in September 2019.  Accordingly, AICPCU's motion for summary judgment is granted with respect to those claims for commissions.

### Posner's WPCL Claims

At Counts III and IV of Posner's amended counterclaims, Posner asserts claims under the WPCL for her unpaid severance and commissions premised on the same facts, evidence, and arguments underlying her breach of contract claims.  The WPCL "provides a statutory remedy when [an] employer breaches a contractual obligation to pay earned wages."  *De Asencio v. Tyson Foods, Inc.*, 342 F.3d 301, 309 (3d Cir. 2003) (internal quotations omitted).  In addition to the unpaid wages, a plaintiff can obtain liquidated damages where the employer lacked a good-faith basis for its failure to pay the earned wages.  43 Pa. Cons. Stat. § 260.10.  Severance and commission payments constitute "wages" under the WPCL.  *See id.* § 260.2a.  As the United States Court of Appeals for the Third Circuit has explained:

> [The] WPCL does not create a right to compensation.  Rather, it provides a statutory remedy when the employer breaches a contractual obligation to pay earned wages.  The contract between

> the parties governs in determining whether specific wages are earned.

*Weldon v. Kraft, Inc.*, 896 F.2d 793, 801 (3d Cir. 1990).  As such, Posner's WPCL claims are wholly dependent on the viability of her above-discussed breach of contract claims.  For the reasons set forth above, Posner's WPCL claims for severance, the unpaid commissions referenced on Exhibit C, and the unpaid commissions referenced on Exhibit D for which client payments were made in September 2019 are unsupported and, therefore, dismissed.

AICPCU further argues that Posner should be precluded, as a matter of law, from recovering liquidated damages on her remaining WPCL claims because Posner has failed to present evidence sufficient to show that AICPCU lacked good faith in its failure to pay the earned wages and that the proffered evidence demonstrates otherwise.  However, AICPCU, as the employer, bears the burden of proof with respect to whether it acted in good faith.  *Yablonski v. Keevican Weiss Bauerle & Hirsch LLC*, 197 A.3d 1234, 1241 (Pa. Super. Ct. 2018); *Wieczorek v. Dempsey, LLC*, 2013 WL 6578788, at *7 (E.D. Pa. Dec. 16, 2013).  Good faith must be proven by clear and convincing evidence.  *Id.*  Good faith is generally a fact question for a jury.  *See Huang v. BP Amoco Corp.*, 271 F.3d 560, 565 (3d Cir. 2001).  Here, Posner has presented evidence that AICPCU retroactively modified the terms of the commission payout structure less than two months before it terminated Posner's employment and that AICPCU refused to pay Posner commissions arguably earned under both the previous and most recently modified commission payout structures.  In light of this disputed evidence, this Court cannot conclude, as a matter of law at this stage, that AICPCU acted in good faith.  Accordingly, AICPCU's motion is denied on this issue.

**CONCLUSION**

For the reasons set forth, this Court finds that Posner has failed to meet her summary judgment burden with respect to her breach of contract, and her WPCL claims for severance and the unpaid commissions referenced on Exhibit C and those referenced on Exhibit D for which client payments were made in September 2019.   Therefore, AICPCU's motion for summary judgment on these claims is granted.  AICPCU's motion is denied in all other respects.[8]  An Order consistent with this Memorandum Opinion follows.

*NITZA I. QUIÑONES ALEJANDRO*, J.

---

[8]      Consistent with this memorandum opinion, the following counterclaims remain for trial: Plaintiff's claims for unpaid commissions (Counts II and IV) identified on Exhibit D for sales that were paid by the respective clients by August 30, 2019.